Lindsey Barnhart (Bar No. 294995)
COVINGTON & BURLING LLP
3000 El Camino Real, 10th Floor
5 Palo Alto Square
Palo Alto, California 94306-2112
Telephone: + 1 (650) 632-4700
Facsimile: + 1 (650) 632-4800
Email:  lbarnhart@cov.com

Gawon Go (*pro hac vice application forthcoming*)
COVINGTON & BURLING LLP
620 Eighth Ave, Suite 3928
New York, NY 10018
Telephone:  +1 (212) 841-1000
Facsimile:  + 1 (646) 441-9115
Email:  ggo@cov.com

*Attorneys for Plaintiff Amy Adams*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Amy Adams,<br><br>     Plaintiff,<br><br>     v.<br><br>Community Housing Partnership, d/b/a HomeRise,<br><br>     Defendant. | Civil Case No.:<br><br>**COMPLAINT:**<br>**(1) BREACH OF IMPLIED WARRANTY OF HABITABILITY;**<br>**(2) BREACH OF IMPLIED COVENANT OF QUIET ENJOYMENT;**<br>**(3) NEGLIGENCE;**<br>**(4) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**<br>**(5) VIOLATION OF FAIR HOUSING ACT;**<br>**(6) VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT;**<br>**(7) VIOLATION OF UNRUH CIVIL RIGHTS ACT;**<br>**(8) VIOLATION OF CALIFORNIA GOVERNMENT CODE § 11135**<br><br>**DEMAND FOR JURY TRIAL** |

## I.    INTRODUCTION

1.     This is a case about a disabled single mother with limited financial means who was denied equal access to housing and had to endure unsafe living conditions for years because of the intentional and negligent actions and inaction of her landlord, who abused its position of power to take advantage of her.

2.     Plaintiff Amy Adams is disabled and receives housing assistance through the Project-Based Voucher ("PBV") program administered by the Housing Authority of the City and County of San Francisco ("SFHA").

3.     From February 2013 to November 2021, Ms. Adams and her family were tenants at a PBV-assisted unit, 1413 Flounder Court, Unit E, San Francisco, CA 94130 ("Unit E"), managed by Defendant HomeRise.

4.     During her tenancy at Unit E, Ms. Adams complained of, and Defendant failed to repair, a variety of habitability issues, including mold, rodent and pest infestation, and inadequate heating, to name a few.  The issues culminated on or around November 27, 2021, when the water heater in Unit E exploded, necessitating emergency evacuation of Ms. Adams and her family, including her then five-month-old son.

5.     Although Defendant temporarily relocated Ms. Adams to 1394 Gateview Court, Unit D, San Francisco, California 94130 ("Unit D") and promised that the habitability concerns of Unit E would be repaired, Defendant failed to deliver.  In the ensuing months, Unit E's habitability problems continued, and the apartment failed multiple inspections.

6.     In addition to the habitability concerns, Ms. Adams has repeatedly requested a larger unit to accommodate her and her daughter's disabilities since around June 2021.  It was also around this time that Ms. Adams welcomed a new child to her home, which further intensified her need for a larger space so that all members of her family could make use of their space without the heightened anxiety, distress, and discomfort of living in unduly confined quarters.

7.     Defendant never properly responded to any of Ms. Adams' reasonable accommodation requests and summarily dismissed them without further investigation.  Defendant also rushed Ms. Adams back to Unit E while falsely claiming that repairs to the unit were completed.

8.      Defendant was well-aware that Ms. Adams suffered from physical and mental disabilities and was struggling financially.  When Ms. Adams raised issue with the fact that Defendant had neglected its legal duties to her and challenged the adequacy of repairs being made to Unit E, Defendant lashed out.  Defendant took advantage of Ms. Adams' vulnerable position and abused its position of power as her landlord by falsely reporting to SFHA that she had abandoned her residence when she had not.  The false reporting risked Ms. Adams becoming homeless, since SFHA, relying on HomeRise's false report, then swiftly terminated Ms. Adams' PBV, which was the only way for her to sustain a stable living environment for her and her family.

9.      Ms. Adams brings this action to recover for the economic, physical, and mental damages she suffered as a result of Defendant's failure to address the defective and hazardous conditions of Unit E, and its failure to provide reasonable accommodation to Ms. Adams for a larger unit, and to enjoin Defendant's unlawful and discriminatory practices.

## II.      PARTIES

10.      Plaintiff Amy Adams is, and at all times mentioned in this Complaint was, a citizen of the United States and a resident of San Francisco County, California.  In or around November 2008, Ms. Adams became a participant in the federally funded PBV program with SFHA.  Since February 2013, Ms. Adams has been a tenant in PBV-assisted housing in the Island Bay Homes property complex managed by Defendant.

11.      Upon information and belief, Defendant Community Housing Partnership, d/b/a HomeRise, is, and at all times mentioned in this Complaint was, a nonprofit corporation registered in California.  Defendant manages approximately 17 property complexes across San Francisco, California which it rents to low-income, disabled, and/or previously homeless individuals and families, including the property in which Ms. Adams resides.  For at least some properties, including the property in which Ms. Adams resides, Defendant contracts with SFHA to receive housing assistance payments.

## III.      JURISDICTION AND VENUE

12.      This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

13.     This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because those claims are so related to Defendant's violations of the Fair Housing Act that they form part of the same case or controversy under Article III of the United States Constitution.

14.     This Court has personal jurisdiction over Defendant because, upon information and belief, Defendant is incorporated and has its principal place of business in California.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because, upon information and belief, Defendant is a resident of this District.  Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**IV.     FACTS**

**A.     PBV Program**

16.     SFHA administers three types of housing assistance programs for low-income families in San Francisco: (1) the Housing Choice Voucher ("HCV") program; (2) the Public Housing program; and (3) the PBV program.

17.     Under the PBV program, a local public housing agency such as SFHA, using federal funding from the U.S. Department of Housing and Urban Development, provides subsidies to specific rental units rented to low-income tenants.  42 U.S.C. § 1437f(o)(13); 24 C.F.R. Part 983.  While the HCV Program is "tenant-based," meaning that the subsidy follows the tenant if he or she moves, PBV assistance is attached to a specific unit.  24 C.F.R. § 983.5.  A tenant participating in the PBV program pays monthly rent to his or her landlord based on the tenant's income.  24 C.F.R. § 983.353.  The local public housing agency pays for the balance of the rent, in the form of a monthly Housing Assistance Payment to the unit's landlord, according to the terms set out in a Housing Assistance Payment contract between the local public housing agency and the landlord.  24 C.F.R. § 983.202.

18.     Upon information and belief, Defendant, then known as Community Housing Partnership, entered into a Housing Assistance Payment contract with SFHA on or around October 4, 2002.

### B.    Ms. Adams' Housing History

19.    Ms. Adams was born in San Jose, California, graduated from Livingston High School, California, and has lived in California all her life.  She is a single mother of eight children, including a young daughter and a newborn son, and takes great joy in looking after her family.

20.    As a single mother, she bears the responsibility of educating, nurturing, and financially supporting her children.

21.    In order to support her family, Ms. Adams has been diligent in searching for, and remaining in, employment.  Ms. Adams has worked as a counselor for disadvantaged youth and disabled adults and a supervisor at a foster agency and group homes.  In or around 2006, Ms. Adams had to transition to temporary jobs, including working as a personal assistant, so that she could care for one of her children who was diagnosed with a psychotic disorder.

22.    Ms. Adams was in a car accident in or around August 2006, where her car was broad-sided by another vehicle.  This accident resulted in a pubic ramus fracture on her left side.

23.    While Ms. Adams eventually recovered from her fracture, she still experiences chronic pain and numbness in her hands and feet to this day.

24.    Ms. Adams thus sought further treatment and diagnosis for these long-term symptoms, and sometime between 2007 and 2009, Ms. Adams was diagnosed with mild bilateral carpal tunnel syndrome.

25.    Following the car accident, Ms. Adams was also diagnosed with depression in or around 2007.

26.    On July 28, 2009, the Social Security Administration determined that Ms. Adams had been disabled and therefore unable to work since August 27, 2006.  Ms. Adams has been receiving Social Security benefits for people with disabilities since this determination.

27.    Ms. Adams' depression, chronic pain, and other disabilities arising from the 2006 car accident made it difficult for Ms. Adams to perform her job.  After struggling to juggle her job responsibilities while managing her various disabilities, in or around 2007, Ms. Adams lost her job and became homeless.

28.     In or around 2008, Ms. Adams and her two then-minor children found respite at Hamilton Family Residence, an emergency shelter, in San Francisco, California.

29.     On or around July 1, 2008, Hamilton Family Residence referred Ms. Adams and her two children to the McKinney Funded Continuum of Care Homeless Services.  The latter wrote a letter to Defendant, recommending Ms. Adams and her children to be housed at one of the properties managed by Defendant.

30.     On or around November 17, 2008, Ms. Adams and her two children became tenants in a one-bedroom unit managed by Defendant at 835 O'Farrell Street, Unit 609, San Francisco, CA 94109. Ms. Adams received PBV assistance while renting that unit.

31.     By December 2012, Ms. Adams' household had grown significantly in size.  She was living with five children, including one godson she agreed to look after so that he could attend a different school to escape bullying.

32.     Recognizing that a one-bedroom was no longer suitable for her growing family and herself, Ms. Adams applied for a reasonable accommodation to transfer to a larger unit.  On or around January 24, 2013, Defendant and SFHA agreed to relocate Ms. Adams and her family to a two-bedroom unit, also managed by Defendant, at Unit E in Island Bay Homes, "to accommodate under-housed situation."

**C.      Lease Agreement**

33.     On or around February 12, 2013, Ms. Adams entered into a written lease agreement ("Agreement") with Defendant, then known as Community Housing Partnership, to rent the two-bedroom unit, Unit E.

34.     Under the Agreement, Defendant was identified as the landlord for the premises.

35.     Section 1(D) of the Agreement provides that the amount of the total rent payable to Defendant is the combination of payment from Ms. Adams and Housing Assistance Payments from SFHA.

36.     Ms. Adams' PBV covered the majority of the rent payment to Defendant for Unit E, and her PBV could not be transferred to a different unit.

37.     Section 1(G) of the Agreement provides that Defendant is responsible for "maintain[ing] the dwelling unit, equipment and appliances, and common areas and facilities, to provide decent, safe and sanitary housing in accordance with the housing quality standards (24 CFR Section 882.109) for the existing Housing Program, including provision of all the services, maintenance and utilities set forth in the [Agreement]."

38.     Section 1(G)(2) of the Agreement further provides that "[e]xtermination services shall be provided by Landlord as conditions may require."

39.     Section 1(I) of the Agreement provides that "[t]he Landlord shall not discriminate against the Tenant Family in the provision of services, or in any other manner, on the grounds of age, race, color, creed, religion, sex, handicap or national origin."

40.     Under the Agreement, the lease between Ms. Adams and Defendant was to continue unless there was "any termination of the Housing Assistance Payments Contract including any termination due to termination of eligibility of the Tenant."

41.     One of the conditions for Ms. Adams to maintain her PBV with SFHA was her occupation of Unit E, and upon its abandonment, she would lose her PBV.  Prior to any termination of PBV, including through any notice of abandonment of Unit E, Ms. Adams was entitled to a hearing.

42.     Defendant was or should have been aware that if it notified SFHA of Ms. Adams' abandonment of Unit E, she would likely lose her PBV assistance and that, absent PBV, Ms. Adams would risk homelessness once again.

**D.     Habitability Issues and Housing Quality Violations**

43.     The respite of having moved to a larger unit to accommodate her six-person household did not last long.  Soon after moving into Unit E, Ms. Adams discovered a number of habitability issues.

44.     For example, sometime after moving in, Ms. Adams started to notice dark spots in various places in the apartment, including around windowsills and on the living room ceiling.  In or around 2018, mold grew visibly larger on the living room ceiling.  Ms. Adams informed Defendant about the issue.

45.     Instead of adequately identifying the source of the mold and exterminating it, Defendant's agent or employee merely painted over the mold.  Not surprisingly, the mold grew back.

46.     In or around 2018, the carpet in Unit E was torn, such that it created a tripping hazard for Ms. Adams and her family.  This was a particularly sensitive issue for Ms. Adams because she suffered from mobility issues arising from her 2006 car accident.

47.     Ms. Adams submitted multiple work orders for the carpet to be changed or repaired.  An inspection by on-site maintenance staff also noted the need for the carpet to be repaired.  However, no repair was made, and as a result, on or around July 8, 2018, Ms. Adams tripped on the carpet and fell, breaking her front tooth and worsening her back pain.  Ms. Adams has since paid thousands of dollars to repair her broken tooth.

48.     The problems with Unit E did not end here:  for several months in 2020-2021, during a period where Ms. Adams was pregnant, the heating system in Unit E did not function properly, resulting in unbearably cold temperatures.  Ms. Adams thus resorted to purchasing a space heater out-of-pocket to keep herself and her family warm.

49.     On or around November 27, 2021, the water heater in Unit E exploded, and Ms. Adams and her family, including her then five-month-old son, had to evacuate to Unit D on an emergency basis.

50.     Ms. Adams' ongoing issues with the habitability of Unit E were confirmed on January 23, 2022, when SFHA Inspector Kenneth Lumpkin conducted an inspection of Unit E, and notified Defendant that Unit E failed to meet the requisite standard of habitability in the following ways:

a)     brown mold-like substance on living room ceiling;

b)     a hole in the wall behind the front door due to inadequate or missing doorstop wall protector;

c)     front door threshold trip hazard due to missing transition strip;

d)     a hole around exhaust vent pipe where pests could get in;

e)     a slow leak from pipe under the kitchen sink;

f)     peeling tub finish, which has skin safety risk;

g)     black mold-like substance around bedroom door frames;

h)     the water heater has no TPR valve and discharge pipe;

i)     front door is too short to prevent entry of rodents and pests; and

j)     tenant report of respiratory safety concerns due to mold and dampness in the unit.

51.     Notwithstanding being on clear notice of these defects through both Ms. Adams' complaints and Inspector Lumpkin's Report, Defendant failed to adequately remedy these issues.

52.     On June 10, 2022, Unit E failed to meet the requisite standard of habitability once again, when Inspector Christina Moy at the San Francisco Department of Building Inspections ("SFDBI") conducted another inspection.

53.     Specifically, Inspector Moy at SFDBI directed Defendant to remedy the following violations within 30 days:

      a)    presence of mold/mildew on the living room ceiling, in violation of Sections 1301, 1001(b)(13), and 1306 of the San Francisco Housing Code;

      b)    evidence of rodents' existence in the building, including multiple openings in walls and floors, in violation of Sections 1001(b) and 1306 of the San Francisco Housing Code;

      c)    missing shower head, in violation of Section 1001 of the San Francisco Housing Code; and

      d)    missing permits for water heater and heating system.

54.     Defendant did not address any of the violations identified by SFDBI.

55.     On September 28, 2022, SFDBI issued a Notice of Director's Hearing to Defendant. SFDBI issues a notice for Director's Hearing when a building owner has not demonstrated a good faith effort to fix a housing code violation.  During the Director's Hearing, the building owner has an opportunity to explain if any violations are not merited or to document the progress made in addressing the violations.

56.     On October 13, 2022, SFDBI held a Director's Hearing.  Defendant did not attend the hearing.  During the hearing, the Hearing Officer found that the conditions of Unit E remained unchanged from the way it was identified in the June 10, 2022, Notice of Violation, and these conditions rendered Unit E an unsafe building or a public nuisance pursuant to Section 102A of the San Francisco Building Code and Section 1001(d) of the San Francisco Housing Code.

57.     Accordingly, SFDBI issued an Order of Abatement to Defendant, and required Defendant to abate all violations cited in the June 10, 2022, Notice of Violation.

58.     As described above, the abysmal conditions of Unit E were well-recorded, and Defendant had ample opportunities to rectify the condition of Unit E.  However, Defendant continued to ignore the habitability issues identified by Ms. Adams, and two government agencies.

59.     Ms. Adams and her children suffered physically and mentally due to the deficient housing conditions that Defendant failed to correct.  Ms. Adams' young daughter developed trouble breathing when sleeping and had to go through surgery to address her sleep apnea.

60.     Upon information and belief, the mold and dampness of the unit contributed to Ms. Adams' young daughter's respiratory issues.  The unsafe living conditions, and the negative health effects on herself and her children, have caused Ms. Adams severe mental anguish.

**E.     Harassment and Threats by Defendant**

61.     During her tenancy at Island Bay Homes, Ms. Adams repeatedly faced harassment, belittlement, and threats to be removed from her home by Defendant's agents or employees.

62.     In or around July 2018, Ms. Adams burned herself on the stove because it was not leveled properly because the floor underneath was crooked.  Ms. Adams submitted a work order, requesting the floor be leveled so that hot pots and pans would not slide off the stove.

63.     Shortly after Ms. Adams' complaint, Max Garcia, the property manager and Defendant's agent, visited Ms. Adams' home unannounced and without providing any reason, by using the master key that was in his possession.

64.     Mr. Garcia rummaged through Plaintiff's kitchenware without permission, and declared that it was her kitchenware, rather than the unleveled stovetop or uneven floor, which caused Plaintiff's burns.  Mr. Garcia did not witness the accident that Plaintiff suffered with regard to the stovetop and is not a medical professional.

65.     Mr. Garcia's surprise visit was intended to, and indeed has, caused distress to Ms. Adams for reporting her physical injury as a result of Defendant's failure to maintain the unit.

66.     The harassment and intimidation intensified following Ms. Adams' temporary relocation to Unit D, as Defendant tried to force Plaintiff back to Unit E despite the habitability issues persisting.

67.     On December 17, 2021, less than one month after the emergency evacuation due to the explosion of the unit's water heater, Defendant's agent Jasmine Williams emailed Ms. Adams, stating

that Unit E was ready for re-occupancy.  Defendant's agent further stated that Ms. Adams had until December 22, 2021 to move back to Unit E, and that the property management would change the locks to Unit D on December 22, 2021, regardless of Ms. Adams' decision to return to Unit E.

68.     That same morning, Ms. Adams awoke to find her three-month-old grandson, who was visiting that day, lifeless in his crib next to the heater.  As paramedics entered Ms. Adams' apartment and fought to revive the child, Defendant's agent entered Ms. Adams' home and attempted to force her to sign documents related to her return to Unit E.  Defendant's agent not only shocked and flustered Ms. Adams, but also aggravated her distress.

69.     Contrary to Defendant's representation, Unit E was not ready for re-occupancy by December 22, 2021 due to various habitability issues.  Indeed, Ms. Adams, through a walk-through of Unit E with property management and by going back to Unit E to check its conditions herself, identified multiple habitability issues that remained in Unit E, including the presence of mold, peeling bathtub finishes, and a missing shower head.

70.     On January 7, 2022, Defendant's agent Jasmine Williams once again emailed Ms. Adams, demanding her family move back to Unit E by January 12.  Ms. Williams repeated the same misinformation that was in her December 17 email:  that the repairs in Unit E has been completed, and that the locks to Unit D would be replaced after January 12.

71.     On that same day, Ms. Adams, through her friend and advocate Melanie Scott, raised concerns about the state of repair in Unit E.  Ms. Scott replied to Defendant's agent Jasmine Williams, stating, "We have reason to believe that some of the cited issues have not been rehabilitated.  [Ms. Adams] has asked management to address the issue of mold several times.  . . . If the problem is not fixed we will be contacting the city code enforcement agency to request an inspection."  In the same email, Ms. Scott requested that Defendant provide information as to what repairs had been completed, including how the mold issue had been addressed.  Ms. Scott also requested an opportunity for Ms. Adams to inspect Unit E before moving back in.  Defendant never responded to this email.

72.     Instead, on January 10, 2022, Defendant posted a Notice of Abandonment (the "Notice") on the door of Unit E.  The Notice did not comply with California statutory requirements.

73.     The Notice repeated the same misinformation as Ms. Williams' December 17, 2021 and January 7, 2022 emails to Ms. Adams:  it stated that Ms. Adams was required to move back to Unit E by January 12, 2022, and the locks to Unit D would be changed on January 12, 2022, after completion of the relocation.  The Notice further stated, "Refusal to vacate unit on January 12, 2022 will result in commencement of the legal abandonment process of 1413E Flounder Court, San Francisco, CA 94130 [Unit E]."

74.     Ms. Adams perceived this Notice as a threat and attempt to exert psychological pressure to force her to return to Unit E, regardless of its conditions.

75.     On January 10, 2022, shortly after receiving the Notice of Abandonment, Ms. Adams emailed Defendant's agents, stating, "I'm not abandoning my unit [Unit E;] I'm saying I don't believe it's ready, habitable or safe for me and my family to move back in."

76.     Finally, on January 11, 2022, Defendant's agent Jasmine Williams addressed Ms. Adams' concern over the adequacy of the repairs in Unit E for the first time.  Ms. Williams sent Ms. Adams five photos, which Ms. Williams claimed to be photographs of repairs that had been made.  None of the photographs provided any real indication about the state of Unit E:

a)      The first photograph was a blurry picture of a sink faucet and surrounding area.

b)      The second photograph was of part of the bathtub, including the faucet, and part of the wall of the shower.

c)      The third photograph was of a portion of wall that appeared to have been patched. The square-like shape in the middle of the wall was a slightly whiter color than the surrounding wall.

d)      The fourth photograph was of the bathtub.  Some peeling appeared around the drain.

e)      The fifth photograph was of a portion of wall that appears to have been patched. A portion of wall just above the floorboard that was approximately rectangular with rounded edges appeared to be a different texture and whiter color than the surrounding wall.

77.     The photographs did not serve as proof that all issues of Unit E, including mold, had been addressed.

78.     On January 11, 2022, in an email in response to the photographs, Ms. Adams pointed out that the front door had not been fixed, and that Defendant had not arranged for a professional evaluation of the mold.  Defendant never responded to this email.

79.     Rather than responding to Ms. Adams' January 11, 2022, email, on January 21, 2022, Defendant's agent Felicia Lee emailed SFHA, falsely stating, "Resident Amy Adams (1413 Flounder Court, Unit E) was temporarily relocated to another unit because her unit needed repair.  The repairs are now complete however, the resident refuses to return to her leased unit."  The email further stated, "This resident has a lease to reside at 1413 Flounder Court, Unit E where the SFHA is providing a subsidy.  Since the resident is living at 1394 Gateview Avenue Unit D, they are in violation of 24 CFR 982.312 which is a Family Absence from the Unit HUD violation."  As a result, according to the email, "HomeRise Management is now issuing an Abandonment Notice to 1413 Flounder Court, Unit E."

80.     Upon information and belief, Defendant targeted Ms. Adams because she was powerless against Defendant, given her disabilities and financial instability, and because ejecting her from Unit E was a faster path to quelling her complaints, rather than actually fixing the unit.

81.     Upon information and belief, Defendant knew that Unit E remained uninhabitable and that Ms. Adams did not intend to abandon the unit at the time of sending the January 21 email.

82.     Ignoring this reality and the inspection report by SFHA on January 23, 2021, on or around April 7, 2022, Defendant sent a key return form to SFHA, dated February 11, 2022, which falsely stated that Ms. Adams had returned the keys of Unit E to the property manager, when in fact, she had not.

83.     Relying on Defendant's false statements regarding Ms. Adams' supposed abandonment of Unit E and her release of the keys to the unit, SFHA terminated Ms. Adams' PBV.

84.     Losing PBV assistance meant that Ms. Adams had no means of paying rent, and that she would likely become homeless.  This had a tremendous impact on Ms. Adams' mental health.  As a person who has experienced homelessness before, Ms. Adams experienced severe mental distress as a result of the risk that she and her children could be homeless once again.

85.     This mental distress caused Ms. Adams to suffer insomnia and severe migraines.

**F.     Reasonable Accommodation Requests**

86.     Defendant and its agents have also failed to provide reasonable accommodation for Ms. Adams' and her daughter's disabilities, and that failure is ongoing.

87.     Ms. Adams suffers from chronic pain as a result of a car accident in 2006.  Since then, the chronic pain has limited Ms. Adams' major life activities — she is often fatigued; she will often drop things; and she has difficulty moving in small spaces.  Ms. Adams also suffers from depression since 2007, and this condition has worsened because of the abysmal living conditions of Unit E.

88.     Following the birth of her son in June 2021, it became apparent to Ms. Adams that she needed extra space in order to move around and to adequately care for her son.  Her disabilities and resulting limited mobility meant that she needed to place items throughout the house that would allow her to care for her newborn son.  For example, she had to set up multiple playpens for her son, because her disability made it impossible for her to move the playpen around the house as needed.  Having a newborn also meant that she needed additional space to store his toys, stroller, diapers, among other things necessary for her newborn son's development.

89.     In addition, Ms. Adams' now 13-year-old daughter receives therapy to address various mental and psychological ailments.  Her child needs a separate bedroom for her mental health disorder.

90.     Shortly after the birth of Ms. Adams' son in June 2021, Ms. Adams conveyed her reasonable accommodation request to be housed in a larger unit to Defendant.  She was told by Defendant's agent(s) that SFHA denied her request.

91.     Upon information and belief, SFHA did not issue any notice of denial of the reasonable accommodation request, and Ms. Adams has no way of knowing whether Defendant ever communicated her reasonable accommodation request to SFHA.

92.     On January 10, 2022, Ms. Adams renewed her request for reasonable accommodation, writing in an email to Defendant's agent, among other things, that her nerve damage made it difficult for her to care for her newborn son in small spaces, and that her daughter needed a separate bedroom for her mental well-being.

93.     Defendant once again informed Ms. Adams, on the same day, that SFHA denied the request.  As with her request in June 2021, upon information and belief, SFHA did not issue any notice of denial of the reasonable accommodation request, and Ms. Adams has no way of knowing whether Defendant ever communicated her reasonable accommodation request to SFHA.

94.     The following day, January 11, 2022, Ms. Adams repeated her reasonable accommodation request to Defendant's agent.

95.     Defendant again summarily dismissed Ms. Adams' request — Defendant's agent replied to Ms. Adams' email saying that Ms. Adams needed to submit the request to SFHA first, even though Defendant's own reasonable accommodation policy directs tenants to submit accommodation requests to the building or property manager.

96.     Because of Defendant's refusal to grant or engage in any process around Ms. Adams' accommodation requests for a larger unit, from her son's birth in June 2021 to November 27, 2021, Ms. Adams was forced to live in a unit smaller than she and her family could reasonably tolerate.

## V.     FIRST CAUSE OF ACTION:  BREACH OF IMPLIED WARRANTY OF HABITABILITY

97.     Ms. Adams repeats and re-alleges the allegations of paragraphs 1-96 as if fully set forth herein.

98.     By entering into the Agreement, and assuming a landlord-tenant relationship with Ms. Adams, Defendant provided implicit warranty that the premises would be habitable.

99.     During Plaintiff's tenancy at Unit E, the unit had numerous material defective conditions, including, but not limited to the following: (1) continued presence of mold in the unit; (2) non-functional heating for several months in 2020-2021; (3) rodent and pest infestation; (4) inadequately-sized front door; (5) holes and inadequately-sealed liminal spaces; (5) shedding bathtub finish; (6) a leak under the kitchen sink; (7) defective water heater, which exploded on or around November 27, 2021.

100.    These conditions were material because they interfered with Plaintiff's ability to enjoy her home without causing undue emotional and mental distress.

101.    These conditions rendered the premises uninhabitable pursuant to Cal. Civ. Code §
1941.1, Cal. Health & Safety Code § 17920.3, California case law, and the San Francisco Housing
Code.

102.    Defendant had actual and constructive knowledge of these defective conditions, as Ms.
Adams repeatedly informed, orally and/or in writing, Defendant of the defective conditions in Unit E.

103.    However, Defendant failed to correct the defective conditions, either effectively or in a
timely manner, as evidenced by the fact that Unit E failed two inspections, on January 23, 2022 and June
10, 2022, respectively, and the housing code violations continued to exist as of October 13, 2022, when
SFDBI held a Director's Hearing and issued an Order of Abatement, all of which took place after Ms.
Adams' own complaint to Defendant.

104.    By failing to correct these defective and hazardous conditions, Defendant breached the
implied warranty of habitability to Ms. Adams.

105.    As a result of Defendant's breach of this warranty, the rental value of the premises was
greatly diminished, and Plaintiff sustained damages in an amount to be proven at trial.  Additionally,
Ms. Adams incurred a number of expenses as a result of the defective conditions, including, but not
limited to, medical expenses.

106.    Ms. Adams also experienced severe mental distress as a result of the defective conditions
in Unit E, which resulted in insomnia and severe migraines.

## VI.    SECOND CAUSE OF ACTION:  BREACH OF IMPLIED COVENANT OF QUIET ENJOYMENT

107.    Ms. Adams repeats and re-alleges the allegations of paragraphs 1-106 as if fully set forth
herein.

108.    By entering into the Agreement, and assuming a landlord-tenant relationship with Ms.
Adams, Defendant provided implicit covenant, under Cal. Civ. Code § 1927 and California case law,
that the tenant shall have quiet enjoyment and possession of the premises.

109.    Defendant failed to properly maintain the premises in a habitable condition because it
failed to address numerous habitability issues as reported by Ms. Adams throughout her tenancy.

110.    That failure substantially interfered with Ms. Adams' full and beneficial use of the premises, by causing significant emotional and psychological distress, making her feel unsafe in her residence, and by causing Ms. Adams and her family's emergency evacuation of Unit E due to the water heater explosion on or around November 27, 2021.

111.    The acts of interference, interruption, deprivation, and disturbance amount to a breach of the covenant of quiet enjoyment implied in all lease agreements.

112.    As a result of Defendant's breach of this implied covenant, Ms. Adams sustained damages in an amount to be proven at trial.

**VII.    THIRD CAUSE OF ACTION:  NEGLIGENCE**

113.    Ms. Adams repeats and re-alleges the allegations of paragraphs 1-112 as if fully set forth herein.

114.    By entering into a written rental agreement, and assuming a landlord-tenant relationship with Ms. Adams, Defendant owed Ms. Adams the duty to exercise reasonable care in its ownership, management, and control of the premises.

115.    This duty encompassed, but was not limited to, the duty to put and maintain its property in a reasonably safe condition.

116.    Defendant negligently and carelessly owned, operated, and managed the premises, by ignoring Ms. Adams' numerous requests for repair of the uninhabitable conditions and/or failing to address them in a timely manner so that the conditions would be fixed.

117.    Defendant's failure resulted in defective and unsafe conditions to persist such that, as alleged above, the conditions violated various California laws and the San Francisco Housing Code.

118.    In failing to properly ensure that the property was in a reasonably safe condition, Defendant breached the duty owed to Ms. Adams.

119.    As a result of Defendant's negligence, Ms. Adams suffered discomfort, annoyance, and emotional distress, and sustained damages in an amount to be proven at trial.

## VIII.   FOURTH CAUSE OF ACTION:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

120.     Ms. Adams repeats and re-alleges the allegations of paragraphs 1-119 as if fully set forth herein.

121.     While Ms. Adams was residing in Unit E, despite her repeated complaints, Defendant failed to correct a number of habitability issues, such as mold contamination, pest and rodent infestation, wrong size of the front door, and holes in the walls.  Defendant's deliberate disregard for the conditions of Unit E led to the water heater explosion and the subsequent traumatic evacuation on or around November 27, 2021.

122.     Defendant then falsely represented, in multiple communications to Ms. Adams, on December 17, 2021, and January 7, 2022, among others, that repairs to Unit E had been completed, in order to deceive Ms. Adams into returning to that unit.

123.     When Ms. Adams raised the fact that the habitability issues in Unit E had not actually been properly addressed, instead of responding to her inquiry, Defendant served her with a Notice of Abandonment.  And even though Ms. Adams made clear to Defendant that she was not abandoning her unit, Defendant went on to report to SFHA that Ms. Adams returned the key to Unit E, causing her PBV subsidy to be revoked.

124.     Upon information and belief, Defendant harassed Ms. Adams by refusing to address any of the habitability concerns that Ms. Adams has pointed out; by refusing to respond to Ms. Adams' numerous inquiries about the adequacy of how the habitability issues in Unit E had been resolved; by falsely reporting that Ms. Adams had abandoned her unit to SFHA, all with the intention of causing her emotional distress and/or with reckless disregard that such conduct could result in Ms. Adams to be without a home; and by trying to obtain Ms. Adams' signature on housing documents while she watched paramedics try to revive her dying grandson.

125.     Defendant's pattern of harassment and intimidation caused Ms. Adams severe emotional distress.  Ms. Adams experienced extreme emotional and psychological stress, manifesting in insomnia and migraines, due to the health and safety hazards in Unit E on her and her children.  The conditions of Unit E were such that a water heater ultimately exploded and caused Ms. Adams and her family to

evacuate the unit on an emergency basis, causing even further emotional distress, insomnia, and migraines for Ms. Adams.

126.    Even after Ms. Adams relocated to Unit D, she was subject to ongoing pressure from Defendant to move back to Unit E, and Defendant falsely represented to Ms. Adams that the conditions of Unit E had been addressed adequately.  Defendant further pressured Ms. Adams to sign related documentation while paramedics were trying to revive her dying grandson.  Defendant eventually falsely reported to SFHA that Ms. Adams has abandoned her unit, knowing that such a report would cause, and did cause, SFHA to terminate Ms. Adams' PBV and Ms. Adams an enormous amount of stress about whether she and her children would have a place to live.

127.    As a result of Defendant's intentional infliction of emotional distress, Ms. Adams sustained actual damages in amount to be determined at trial.

128.    Defendant knew that Ms. Adams was a disabled person with limited financial means and that losing the PBV would significantly increase Ms. Adams' chances of becoming homeless.

129.    Defendant took advantage of Ms. Adams' vulnerable position and intentionally sabotaged the well-being of Ms. Adams and her family.

130.    Therefore, Ms. Adams is entitled to punitive damages because the conduct alleged herein amounts to malicious and/or oppressive conduct within the meaning of Cal. Civ. Code § 3294.

## IX.    FIFTH CAUSE OF ACTION:  VIOLATION OF FAIR HOUSING ACT

131.    Ms. Adams repeats and re-alleges the allegations of paragraphs 1-130 as if fully set forth herein.

132.    Ms. Adams has disabilities within the meaning of the Fair Housing Act, including, but not limited to, chronic pain and depression.  In addition, Ms. Adams' daughter has disabilities within the meaning of the statute, including, but not limited to, mental health conditions.

133.    Defendant knew or should reasonably be expected to know of the disabilities because Defendant and/or its agents interacted with Ms. Adams and received complaints from Ms. Adams whereby she disclosed her and her daughter's disabilities.

134.    Ms. Adams repeatedly requested reasonable accommodation for a larger unit for her and her daughter's disabilities, including, but not limited to, on or around June 30, 2021, January 10, 2022, and January 11, 2022.

135.    The accommodation is necessary to afford Ms. Adams and her daughter equal opportunity to enjoy and use the dwelling.

136.    The accommodation would not have caused an undue burden on Defendant because, upon information and belief, other units larger than Unit E were available and relocating Ms. Adams to a larger unit would not have required displacement of any other tenants or cause an undue administrative or financial burden on Defendant.

137.    Defendant refused to make the requested accommodation, in violation of 42 U.S.C. § 3604(f).

138.    As a result of Defendant's refusal to make the requested accommodation, Plaintiff suffered discomfort, annoyance, and emotional distress, and sustained damages in an amount to be proven at trial.

## X.    SIXTH CAUSE OF ACTION:  VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT

139.    Ms. Adams repeats and re-alleges the allegations of paragraphs 1-138 as if fully set forth herein.

140.    Ms. Adams has disabilities within the meaning of the California Fair Employment and Housing Act, including, but not limited to, chronic pain and depression.  In addition, Ms. Adams' daughter has disabilities within the meaning of the statute, including, but not limited to, mental health conditions.

141.    Defendant knew or should reasonably be expected to know of the disabilities because Defendant and/or its agents interacted with Ms. Adams and received complaints from Ms. Adams whereby she disclosed her and her daughter's disabilities.

142.    Ms. Adams repeatedly requested reasonable accommodation for a larger unit for her and her daughter's disabilities, including, but not limited to, shortly after June 30, 2021, on January 10, 2022, and on January 11, 2022.

143.    The accommodation is necessary to afford Ms. Adams and her daughter equal opportunity to enjoy and use the dwelling.

144.    The accommodation would not have caused an undue burden on Defendant because upon information and belief, other units larger than Unit E were available and relocating Ms. Adams to a larger unit would not have required displacement of any other tenants or cause an undue administrative or financial burden on Defendant.

145.    Defendant refused to make the requested accommodation, in violation of Cal. Gov't Code §§ 12955, 12927(c)(1).

146.    As a result of Defendant's refusal to make the requested accommodation, Plaintiff suffered discomfort, annoyance, and emotional distress, and sustained damages in an amount to be proven at trial.

## XI.    SEVENTH CAUSE OF ACTION:  VIOLATION OF UNRUH CIVIL RIGHTS ACT

147.    Ms. Adams repeats and re-alleges the allegations of paragraphs 1-146 as if fully set forth herein.

148.    Ms. Adams has disabilities within the meaning of the Unruh Civil Rights Act, including, but not limited to, chronic pain and depression.  In addition, Ms. Adams' daughter has disabilities within the meaning of the statute, including, but not limited to, mental health conditions.

149.    Defendant knew or should reasonably be expected to know of the disabilities because Defendant and/or its agents interacted with Ms. Adams and received complaints from Ms. Adams whereby she disclosed her and her daughter's disabilities.

150.    Ms. Adams repeatedly requested reasonable accommodation for a larger unit for her and her daughter's disabilities, including, but not limited to, on or around June 30, 2021, January 10, 2022, and January 11, 2022.

151.    The accommodation is necessary to afford Ms. Adams and her daughter equal opportunity to enjoy and use the dwelling.

152.    The accommodation would not have caused an undue burden on Defendant because upon information and belief, other units larger than Unit E were available and relocating Ms. Adams to a

larger unit would not have required displacement of any other tenants or cause an undue administrative or financial burden on Defendant.

153.    Defendant refused to make the requested accommodation, in violation of Cal. Civ. Code § 51(b).

154.    As a result of Defendant's refusal to make the requested accommodation, Plaintiff suffered discomfort, annoyance, and emotional distress, and sustained damages in an amount to be proven at trial.

**XII.   EIGHTH CAUSE OF ACTION:  VIOLATION OF CALIFORNIA GOVERNMENT CODE § 11135**

155.    Ms. Adams repeats and re-alleges the allegations of paragraphs 1-154 as if fully set forth herein.

156.    Upon information and belief, Defendant receives funding from SFHA which is organized under state law, Cal. Health & Safety Code § 34240.  As such, Defendant receives funding from the state of California and is thus subject to California Government Code § 11135.

157.    Ms. Adams has disabilities within the meaning of California Government Code § 11135, including, but not limited to, chronic pain and depression.  In addition, Ms. Adams' daughter, has disabilities within the meaning of the statute, including, but not limited to, mental health conditions.

158.    Defendant knew or should reasonably be expected to know of the disabilities, because Defendant and/or its agents interacted with Ms. Adams and received complaints from Ms. Adams whereby she disclosed her and her daughter's disabilities.

159.    Ms. Adams repeatedly requested reasonable accommodation for a larger unit for her and her daughter's disabilities, including, but not limited to, on or around June 30, 2021, January 10, 2022, and January 11, 2022.

160.    The accommodation is necessary to afford Ms. Adams and her daughter equal opportunity to enjoy and use the dwelling.

161.    The accommodation would not have caused an undue burden on Defendant because, upon information and belief, other units larger than Unit E were available and relocating Ms. Adams to a

larger unit would not have required displacement of any other tenants or cause an undue administrative or financial burden on Defendant.

162.    Defendant refused to make the requested accommodation, in violation of California Government Code § 11135.

163.    As a result of Defendant's refusal to make the requested accommodation, Plaintiff suffered discomfort, annoyance, and emotional distress, and sustained damages in an amount to be proven at trial.

## XIII.    PRAYER FOR RELIEF

Wherefore, Plaintiff Amy Adams prays for judgment as follows:

A.    A court order enjoining all unlawful practices complained about herein and requiring Defendant to grant Ms. Adams' reasonable accommodation requests;

B.    Economic damages, including compensatory and consequential damages, according to proof at trial, and any interest thereon;

C.    Punitive damages as deemed appropriate by the Court and interest thereon;

D.    Damages for emotional distress;

E.    Statutory damages pursuant to Cal. Civ. Code § 52;

F.    Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2), Cal. Gov't Code § 12989.2, and Cal. Civ. Code § 52; and

G.    For such other relief as the Court deems just and proper.

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND JURY TRIAL

## XIV.   JURY DEMAND

Plaintiff Amy Adams hereby demands a trial by jury on all issues so triable.

Dated: November 22, 2023                 Respectfully submitted,

                                          COVINGTON & BURLING LLP


                                By:   */s/ Lindsey Barnhart*
                                      Lindsey Barnhart (Bar No. 294995)
                                      COVINGTON & BURLING LLP
                                      3000 El Camino Real, 10th Floor
                                      5 Palo Alto Square
                                      Palo Alto, California 94306-2112
                                      Telephone:  + 1 (650) 632-4700
                                      Facsimile:  + 1 (650) 632-4800
                                      Email:  lbarnhart@cov.com

                                      Gawon Go (*pro hac vice application forthcoming*)
                                      COVINGTON & BURLING LLP
                                      620 Eighth Ave, Suite 3928
                                      New York, NY 10018
                                      Telephone:  +1 (212) 841-1000
                                      Facsimile:  + 1 (646) 441-9115
                                      Email:  ggo@cov.com

                                      *Attorneys for Plaintiff Amy Adams*